No. 25-1847

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

STEPHANIE SCHOLL and FRANK BEDNARZ,

Plaintiffs-Appellants,

v.

ILLINOIS STATE POLICE; BRENDAN F. KELLY, *in his official capacity as Director of the Illinois State Police*; JAY ROBERT PRITZKER*, in his official capacity as Governor of the State of Illinois*; KWAME RAOUL*, in his official capacity as Attorney General of Illinois*,

Defendants-Appellees.

On Appeal from the United States District Court
for the Northern District of Illinois
No. 1:24-cv-4435
Honorable Martha M. Pacold

**Appellants' Brief and Short Appendix**

Reilly Stephens
Jeffrey M. Schwab
Brendan Philbin
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
rstephens@ljc.org
jschwab@ljc.org

*Attorneys for Plaintiffs-Appellants*

**Disclosure Statement**

1.  The full name of every party the undersigned attorney represents in the case: Plaintiffs-Appellants Stephanie Scholl and Frank Bednarz.

2.  The name of all law firms whose partners or associates have appeared on behalf of the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this Court: the Liberty Justice Center.

3.  If the party or amicus is a corporation: not applicable.

/s/ Jeffrey M. Schwab
Jeffrey Schwab
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org

*Counsel for Plaintiffs-Appellants*

# Table of Contents

Disclosure Statement......................................................................................i

Table of Authorities .....................................................................................iii

Jurisdictional Statement................................................................................1

Statement of Issues Presented for Review ...................................................1

Statement of the Case ...................................................................................2

Summary of Argument ..................................................................................4

Standard of Review........................................................................................6

Argument .......................................................................................................6

    I.     Defendants' tracking of Plaintiffs constitutes a search in
         violation of their Fourth Amendment rights .........................................6

    II.    The decision below was in error............................................................17

    III.   This violation of Plaintiffs' privacy constitutes irreparable
         harm and satisfies the other preliminary injunction factors ...............18

    IV.   Plaintiffs have standing to challenge the warrantless use of
         the LEARN database ............................................................................21

    V.    Defendants are not entitled to sovereign immunity .............................22

Conclusion......................................................................................................24

Certificate of Compliance .............................................................................26

Certificate of Service......................................................................................27

Required Short Appendix...............................................................................28

## Table of Authorities

*Cases*

*ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012).................................................19

*Bell v. City of Chi.*, 835 F.3d 736 (7th Cir. 2016) ...........................................7

*Brigham City v. Stuart*, 547 U.S. 398 (2006)...................................................7

*Carpenter v. United States*, 585 U.S. 296 (2018)........................... 1, 4, 9, 10, 13

*Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184 (4th Cir. 2013) .................20

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)..............................................21

*City of Los Angeles v. Patel*, 576 U.S. 409 (2015) ............................................7

*Commonwealth v. Bell, Circuit Court of The City of Norfolk*, Case No.
CR23001500-00; 01; 02, 2024 Va. Cir. LEXIS 77 (May 10, 2024)..............14

*Commonwealth v. McCarthy*, 484 Mass. 493, 142 N.E.3d 1090 (2020) ..........15

*Commonwealth v. Watkins*, 2021 Pa. Dist. & Cnty. Dec. LEXIS 2485
(Dec. 15, 2021)..............................................................................................16

*Doe v. Holcomb*, 883 F.3d 971 (7th Cir. 2018) ...................................................23

*Elrod v. Burns*, 427 U.S. 347 (1976)........................................................ 18–19

*Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641 (7th Cir. 2006) ...................24

*Ex Parte Young*, 209 U.S. 123 (1908) ................................................................22

*Graham v. Connor*, 490 U.S. 386 (1989) ...........................................................20

*In re Dairy Mart Convenience Stores Inc.*, 411 F.3d 367 (2d Cir. 2005)...........24

*Joelner v. Vill. of Wash. Park*, 378 F.3d 615 (7th Cir. 2004)...................... 19–20

*Katz v. United States*, 389 U.S. 347 (1967).......................................................7

*Kentucky v. King*, 563 U.S. 452 (2011) ...........................................................7

*Kyllo v. United States*, 533 U.S. 27 (2001).......................................................12

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330 (4th
Cir. 2021)............................................................................................... 11, 18

*Marshall-Mosby v. Corp. Receivables, Inc.*, 205 F.3d 323 (7th Cir. 2000) .........6

*Milliken v. Bradley*, 433 U.S. 267 (1977) .....................................................22

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009) ........................18

*MSA Realty Corp. v. Illinois*, 990 F.2d 288 (7th Cir. 1993) ............................22

*Naperville Smart Meter Awareness v. City of Naperville*, 900 F.3d 521
    (7th Cir. 2018) ......................................................................................14

*Quern v. Jordan*, 440 U.S. 332 (1979)..........................................................22

*Riley v. California*, 573 U.S. 373 (2014).......................................................12

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ....................................20

*Schmidt v. City of Norfolk*, Civil Action No. 2:24-cv-621, 2025 U.S.
    Dist. LEXIS 21096, at *5 (E.D. Va. Feb. 5, 2025).................................14

*Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008).....................................6

*United States v. Bowers*, No. 2:18-CR-00292-DWA, 2021 U.S. Dist.
    LEXIS 196899 (W.D. Pa. Oct. 11, 2021)...............................................16

*United States v. Brown*, No. 19-cv-949, 2021 U.S. Dist. LEXIS 206153
    (N.D. Ill. Oct. 26, 2021) .......................................................................17

*United States v. Curry*, 965 F.3d 313 (4th Cir. 2020) ......................................7

*United States v. Graham*, No. 21-645, 2022 U.S. Dist. LEXIS 163818
    (D.N.J. Sep. 12, 2022)...........................................................................16

*United States v. Jones*, 565 U.S. 400 (2012) ............................................... 8, 9

*United States v. Knotts*, 460 U.S. 276 (1983)............................................ 7, 18

*United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010)..............................11

*United States v. Rubin*, 556 F. Supp. 3d 1123 (N.D. Cal. 2021) ............... 15–16

*United States v. Smith*, 110 F.4th 817 (5th Cir. 2024) ...................................12

*United States v. Soybel*, 13 F.4th 584 (7th Cir. 2021).....................................13

*United States v. Tuggle*, 4 F.4th 505 (7th Cir. 2021) ................................. 8, 13

*United States v. Yang*, 958 F.3d 851 (9th Cir. 2020) ......................................15

*Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381 (1998) ...........................................22

*Woods v. Buss*, 496 F.3d 620 (7th Cir. 2007) .......................................................6

## *Statutes and Other Authorities*

28 U.S.C. § 1291 ...............................................................................................1

28 U.S.C. § 1331 ...............................................................................................1

28 U.S.C. § 1343 ...............................................................................................1

42 U.S.C. § 1983 ........................................................................................ 1, 22

605 ILCS 140/1 .................................................................................................2

Fed. R. Civ. P. 12(b)(6).....................................................................................6

U.S. Const. amend IV. .......................................................................................7

## Jurisdictional Statement

The United States District Court for the Northern District of Illinois had jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims allege violations of the Fourth Amendment to the United States Constitution; and 28 U.S.C. § 1343, because relief is sought under 42 U.S.C. § 1983. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because Plaintiffs-Appellants filed a timely Notice of Appeal on May 16, 2025, appealing the District Court's May 2, 2025 Judgment, Short Appendix ("S.A.") 19, its March 31, 2025 Memorandum Opinion and Order granting Defendants' motion to dismiss and denying Plaintiffs' motion for preliminary injunction, Short Appendix, S.A. 1, and its accompanying Minute Entry dated May 31, 2025, S.A. 20.

## Statement of Issues Presented for Review

The State of Illinois uses a system of over 300 Automated License Plate Reader ("ALPR") cameras, to track everyone who passes them. It retains this data, even without suspicion of wrongdoing, just in case a particular citizen could be an appropriate target of law enforcement in the future.

The issue raised in this case is whether, in light of the Supreme Court's decision in *Carpenter v. United States*, 585 U.S. 296 (2018)—holding that warrantless tracking of cell phone locations violated the Fourth Amendment—this system of ALPRs violates Plaintiffs' Fourth Amendment rights. Specifically, the issues before this Court are: (1) whether the district court erred in dismissing Plaintiffs' complaint for failure to state a Fourth Amendment claim; (2) whether the district

1

court erred in dismissing Plaintiffs' complaint against Defendants, Jay R. Pritzker, Kwame Raoul, and Brendan F. Kelly, for lack of jurisdiction; and (3) whether the district court erred in denying Plaintiffs' motion for preliminary injunction.

**Statement of the Case**

After the 2019 shooting of a postal worker on an I-57 expressway, Illinois passed the Tamera Clayton Expressway Camera Act (the "Act"), 605 ILCS 140/1 et seq., which funded the installation of more than 300 Automated License Plate Reader ("ALPR") cameras across every expressway in Cook County—I-90 Kennedy, I-290 Eisenhower, I-55 Stevenson, I-94 Dan Ryan, the Bishop Ford, and I-57. S.A. 25. An ALPR does what it sounds like: each camera records every car that drives by, identifies the car based on its license plate, and stores the fact that that car drove by the given camera at the given time. S.A. 25–26. Law enforcement then uses this information in one of two primary ways. First, the information is used prospectively for locating a car's present location—perhaps to find a fleeing suspect or missing person. S.A. 26. Second, and more troublingly, Defendants store the record of every car captured by each camera for 90 days, so Defendants can reconstruct the past movements of any citizen. S.A. 29.

The ALPRs that the Illinois State Police ("ISP") have installed for this purpose are made by Vigilant, a subsidiary of Motorola Solutions. S.A. 29. The cameras feed into Vigilant's Law Enforcement Archival Reporting Network ("LEARN"), a national database that aggregates ALPR data from each law enforcement agency nationwide—state, local, and federal—that uses Vigilant ALPRs. These law

2

enforcement agencies across the country can access each other's camera information. Other law enforcement agencies that are Vigilant customers can see license plates captured by ISP's cameras, and ISP can access the billions of datapoints collected by other jurisdictions' ALPRs around the country. S.A. 29. According to ISP's publicly available data, ISP's retention of ALPR records for 90 days means that, at any given time, ISP is in possession of approximately 350 to 450 million "Detections" (when a car is recorded driving past a camera), augmented by the billions more in the LEARN database. S.A. 29. ISP can access this data at its discretion—there is no requirement that it obtain a warrant or make any showing of probable cause or reasonable suspicion before accessing the historical tracking data on any citizen. S.A. 24. In 2022, Illinois passed an updated version of the Act, which expands the use of ALPRs to 20 additional counties around the state—the installation of which has already begun. S.A. 27.

Plaintiffs are two Cook County residents who regularly drive their own personal vehicles. S.A. 24. ISP records every time Plaintiffs drive around Cook County, and it stores that information for future criminal investigations of Plaintiffs, without any probable cause or reasonable suspicion—so that, simply by living in the Chicago area and having a car, Plaintiffs are subject to constant, daily tracking of their movement. S.A. 30.

### *Procedural History*

Plaintiffs filed this case on May 30, 2024. The District Court issued its opinion granting Defendants' Motion to Dismiss and denying Plaintiffs' Motion for

Preliminary Injunction on March 31, 2025, S.A. 1, and entered final judgment on May 2, 2025, S.A. 19. Plaintiffs timely filed their notice of appeal on May 16, 2025.

## Summary of Argument

Plaintiffs, Cook County residents subject to Defendants' mass surveillance system, filed a motion to preliminarily enjoin Defendants from accessing the data Defendants are actively collecting. Defendants track the movements of Plaintiffs— and anyone else in Cook County who drives a car or truck—everywhere they go, every day, without a warrant, or probable cause, or reasonable suspicion, or any limitation at all. Defendants' policy is to track every innocent citizen and later decide which is a reasonable target for law enforcement.

The Fourth Amendment requires more. Plaintiffs' motion sought to enjoin Defendants such that, for the duration of this litigation, they may only access the collected data after obtaining a warrant, which would reasonably balance any legitimate law enforcement interest Defendants claim, while providing the most basic protection for Plaintiffs, who are currently enduring a daily violation of their Fourth Amendment rights.

Nonetheless, the district court denied Plaintiffs' motion for preliminary injunction and dismissed Plaintiffs' complaint for failure to state a claim under the Fourth Amendment. But the district court's actions were incorrect.

The court below distinguished *Carpenter v. United States*, 585 U.S. 296 (2018), holding that the data here is fundamentally different than in *Carpenter*, and that the "search" in *Carpenter* was the subpoena to the phone company, whereas it was

the government's own collection of the data in this case. S.A. 10–17. But the court below fundamentally misunderstands both *Carpenter* and the injury alleged by Plaintiffs. Plaintiffs' injury in this case is not that the ALPR data might one day be used against them in a court of law, but that the collection and searching of the ALPR data without constitutional process itself is an unreasonable search in violation of the Fourth Amendment. Further, the district court's reliance on automobile search cases that predate the Supreme Court's decision in *Carpenter* was in error. The point of *Carpenter* is that the aggregation of data is distinguishable from the collection of one or two data points, like those pre-*Carpenter* automobile search cases. Because of this misunderstanding, the district court erred both in denying Plaintiffs' motion for preliminary injunction and dismissing Plaintiffs' complaint for failure to state a claim.

The district court also erred in dismissing the complaint against Defendants Pritzker, Raoul, and Kelly because it held that those defendants are protected by Eleventh Amendment immunity. S.A. 7–9. But that holding ignores the fact that Plaintiffs are not seeking damages against those defendants and that Defendants Pritzker and Raoul both have a direct role and direct authority over the operation of the challenged program. Therefore, they are not entitled to Eleventh Amendment immunity.

For these reasons, this Court should reverse the district court's order dismissing the Complaint for failure to state a claim, dismissing the claims against Defendants

Pritzker, Raoul, and Kelly for lack of jurisdiction, and denying Plaintiffs' motion for preliminary injunction.

## Standard of Review

This Court reviews an order granting a motion to dismiss under Fed. R. Civ. P. 12(b)(6) de novo, construing the Complaint in the light most favorable to the Plaintiffs, "accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [the plaintiffs'] favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Dismissal under Rule 12(b)(6) is proper only where the plaintiff can prove no set of facts that would entitle him to relief. *Marshall-Mosby v. Corp. Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000).

This Court reviews the denial of a preliminary injunction under the abuse of discretion standard: Legal conclusions are reviewed de novo and findings of fact are reviewed for clear error. *Woods v. Buss*, 496 F.3d 620, 622 (7th Cir. 2007).

## ARGUMENT

### I. Defendants' tracking of Plaintiffs constitutes a search in violation of their Fourth Amendment rights.

Defendants' warrantless, suspicionless, probable-cause-free tracking of Plaintiffs' movements everywhere they drive is a Fourth Amendment search that violates their constitutional privacy interest in the whole of their physical movements. Illinois is tracking Plaintiffs everywhere they go around Cook County— and in the future, the state hopes to track everywhere they go throughout the state.

This comprehensive tracking of every innocent citizen's movements violates the fundamental privacy protections the Constitution grants to each of us.

The Fourth Amendment protects persons from unreasonable searches of their homes and property. *See* U.S. Const. amend IV. A search occurs when the government intrudes on a reasonable expectation of privacy that society is prepared to recognize as legitimate. *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). Searches conducted without a warrant are "presumptively unreasonable." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).

"Any Fourth Amendment analysis . . . must be grounded on an accurate understanding of the facts." *United States v. Curry*, 965 F.3d 313, 316 (4th Cir. 2020). Thus, "when addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant." *City of Los Angeles v. Patel*, 576 U.S. 409, 419 (2015). "Stated differently, Plaintiffs must show the [law's] actual applications are unconstitutional." *Bell v. City of Chi.*, 835 F.3d 736, 739 (7th Cir. 2016).

Twentieth-century Fourth Amendment doctrine provided little protection for things one did in public, including the public movements of one's car. *See, e.g. United States v. Knotts*, 460 U.S. 276, 281 (1983). But the advent of new technologies has led to the development of a different approach, in the face of decreasing marginal costs of mass surveillance and increasing ubiquity of

surveillance technology. *See United States v. Tuggle*, 4 F.4th 505, 509 (7th Cir. 2021) ("Nonetheless, we are steadily approaching a future with a constellation of ubiquitous public and private cameras accessible to the government that catalog the movements and activities of all Americans.").

In *United States v. Jones*, 565 U.S. 400 (2012), the government attached a GPS tracking device under the bumper of a suspect's car, tracking his movements constantly for a month. The defendant's movements were all public, the sort of thing that an old-fashioned tail could in theory have captured, but there was no longer a resource constraint on the government's ability to tail someone so comprehensively. Although the majority opinion in *Jones* was content to resolve the case as an illegal trespass (the physical attachment of the tracker to the suspect's property), five justices expressed concern that "physical intrusion is now unnecessary to many forms of surveillance . . . [so that] the monitoring undertaken in this case [could be done] by enlisting factory—or owner—installed vehicle tracking devices or GPS-enabled smartphones." *Id.* at 415 (Sotomayor, J., concurring) (emphasis added); *see also id.* at 428 (Alito, J., concurring). There was no majority view as to how long such tracking would have to last to violate the Fourth Amendment, but five justices agreed that "at the very least, longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy." *Id.* at 415 (Sotomayor, J., concurring) (internal quotation marks omitted). Justice Sotomayor went further, arguing that the Court should consider "whether people reasonably expect that their movements will be recorded and aggregated in a

manner that enables the Government to ascertain, more or less at will, their political and religious beliefs, sexual habits, and so on." *Id*. It did not matter to Justice Sotomayor that the government might obtain the fruits of GPS monitoring through lawful conventional surveillance techniques. *Id*.

In *Carpenter v. United States*, 585 U.S. 296 (2018), the Court answered the question that the majority in *Jones* left open, holding that warrantless tracking of cell phone locations violated the Fourth Amendment. The government in *Carpenter* had obtained records from the phone company of which cell towers the defendant's phone connected to over the course of several months, and unfortunately for Mr. Carpenter the locations matched up with a string of robberies. The majority opinion held that, even though the data in question recorded public movements, "[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere." *Id*. at 310. The Court embraced the view taken by the concurrences in Jones:

> Prior to the digital age, law enforcement might have pursued a suspect for a brief stretch, but doing so for any extended period of time was difficult and costly and therefore rarely undertaken. For that reason, society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period.

*Id*. (quoting *Jones*, 565 U.S. at 429 (Alito, J., concurring)) (internal quotation marks and citations omitted). The Court stressed that the backward-looking nature of the cell phone records was particularly troubling:

> Moreover, the retrospective quality of the data here gives police access to a category of information otherwise unknowable. In the past, attempts to reconstruct a person's movements were limited by a dearth of records and the frailties of recollection. With access to CSLI, the Government can now travel back in time to retrace a person's whereabouts, subject only to the retention polices of the wireless carriers.

*Id.* at 312. The search therefore "invaded Carpenter's reasonable expectation of privacy in the whole of his physical movements." *Id.* at 313.

Like the cell-phone location data in *Carpenter*, ALPR data is generated involuntarily. Like carrying a cell phone, traveling in a car on highways is an indispensable feature of contemporary life. Like the phone data in *Carpenter*, ALPR data is historical and searchable, allowing authorities to simply track everyone and later decide whom among the population to investigate Like cell phones, license plates and the automobiles they are affixed to are specifically associated with the owner of the property being tracked. Indeed, the government's collection of ALPR data is in many ways more concerning than its use of cell-phone data in *Carpenter*. Here, all the ALPR data is in the hands of the State in the first instance—in *Carpenter*, the data was in possession of the phone companies, and the government had to specifically request the records of the specific suspect.

The court below focused on the fact that the ALPR data only captures the movement of the car, and not Plaintiffs' movements after they get out of the car. S.A. 17. But the cell phone in *Carpenter* likewise only provided a limited set of data points: each cell tower Mr. Carpenter's phone connected to on the relevant days. Individual ALPR detections are in fact more precise, taking a photo of a car at a specific location, whereas the cell-site location information was only accurate to the

range of a given cell tower. And even relatively "low resolution" data, when aggregated together, can tell the government a great deal about our lives. As the Fourth Circuit explained in striking down Baltimore's aerial surveillance program under Carpenter:

> We do not suggest that the AIR program allows perfect tracking of all individuals it captures across all the time it covers. Though data is collected in 12-hour increments, the tracks are often shorter snippets of several hours or less. Still, the program enables photographic, retrospective location tracking in multi-hour blocks, often over consecutive days, with a month and a half of daytimes for analysts to work with. That is enough to yield "a wealth of detail," greater than the sum of the individual trips.

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 342 (4th Cir. 2021). Such data "enables deductions about what a person does repeatedly, what he does not do, and what he does ensemble, which reveals more about a person than does any individual trip viewed in isolation." *Id.* (quoting *United States v. Maynard*, 615 F.3d 544, 562–63 (D.C. Cir. 2010) (cleaned up). Defendants record every time a citizen goes to the hospital, or the family planning clinic, or the NRA convention, or BlackLivesMatter rally; when they go out to dinner with friends, or visit a romantic partner—any one datapoint may be of limited use, but the aggregation allows Defendants to deduce the intimate details of each of our lives. "*Carpenter* held those deductions go to the privacies of life, the epitome of information expected to be beyond the warrantless reach of the government. And here, as there, the government can deduce such information only because it recorded everyone's movements." *Leaders of a Beautiful Struggle*, 2 F.4th at 342 (internal citations omitted).

Nor is it an answer to suggest that citizens concerned about privacy simply rely on public transportation. The entire point of *Carpenter*—and *Jones*—is that citizens do not forfeit their expectation of privacy simply by living in the modern world. *See Kyllo v. United States*, 533 U.S. 27 (2001) (extending Fourth Amendment warrant requirement to thermal imaging technology). As the Fifth Circuit recently held, even ostensibly voluntary opt-in features such as location tracking don't necessarily vacate any expectation of privacy. *United States v. Smith*, 110 F.4th 817, 835 (5th Cir. 2024) ("These requests typically innocuously promise app optimization, rather than reveal the fact that users' locations will be comprehensively stored in a 'Sensorvault,' providing Google the means to access this data and share it with the government.").

Like cell phones, cars are a ubiquitous feature of modern life, and the Supreme Court has consistently found that Fourth Amendment doctrine must accommodate itself to the technological needs of our day. Which is why, for instance, the Court rejected searching cell phones incident to arrest, finding that a person's cell phone now contains far more personal information than the purses and wallets of prior Fourth Amendment cases. *Riley v. California*, 573 U.S. 373, 393 (2014); *see also Kyllo*, 533 U.S. at 34 (thermal imaging camera required a warrant).

This Court's cases applying *Carpenter* confirm as much. This Court has noted that *Carpenter* was concerned with the ability to aggregate historical location data and recognized that "the warrantless acquisition of that type of data implicates unique privacy interests," because such data "provides a detailed record of a person's past movements, which is made possible so long as he carries a cell phone."

*United States v. Soybel*, 13 F.4th 584, 587 (7th Cir. 2021). As both the Supreme Court and the Seventh Circuit have recognized,

> the privacy concern is magnified by the data's retrospective quality because historical CSLI gives police access to a category of information otherwise unknowable. Obtaining historical CSLI without a warrant would allow the government to effectively travel back in time to retrace a person's whereabouts, subject only to the retention polices of the wireless carriers.

*Id*. at 592 (quoting *Carpenter*, 585 U.S. at 315) (cleaned up). The result is a "detailed chronicle of a person's physical presence compiled every day, every moment, over several years . . . [that] implicates privacy concerns far beyond those considered" by more traditional Fourth Amendment doctrine. *Id*. As with cell phone data, the historical location data collection that Plaintiffs challenge allows the government to simply track every citizen, and "travel back in time" whenever authorities decide they'd like to retrace any of our whereabouts. This happens effectively every day, when Plaintiffs go to work, or to the grocery store, or the doctor's office. And while ISP's policy choice is to only retain the data for 90 days—not much less than the 127 days of data the government collected in Carpenter—nothing prevents Defendants from changing that policy to 120 days, or 365, or a decade.

Even when this Court has rejected *Carpenter*-based claims, it has done so on grounds that drive home just how much more like *Carpenter* this case is. For instance, this Court concluded that it is not a violation of the Fourth Amendment under *Carpenter* to set up three cameras in a single public location, even if those cameras record that single location continually for months. *Tuggle*, 4 F.4th 505. Plaintiffs here are not challenging three cameras in one place; they're challenging

hundreds of cameras all over Cook County. The cameras did not follow Tuggle around town, and they did not invade the interior of his home. There was therefore no search because there was no expectation of privacy in what was taking place in public at a single location. In this case, by contrast, the data tracking follows Plaintiffs across Cook County—and even beyond it, as the Vigilant system aggregates data nationally. Tuggle is not a case about the aggregation of physical movements across both time and space—it is simply about a single set of cameras at a single location. Likewise, A power company's recording of home electricity use, for purposes of billing customers, didn't violate the Fourth Amendment because it was done by the utility company and not for a law enforcement purpose. *Naperville Smart Meter Awareness v. City of Naperville*, 900 F.3d 521, 528 (7th Cir. 2018) ("Critically, Naperville conducts the search with no prosecutorial intent"). Here, the express purpose of this tracking is for later investigation of crimes.

As this technology is new, there is little case law directly addressing ALPRs and the Fourth Amendment. The Eastern District of Virginia recently denied a Motion to Dismiss in a case raising substantively similar claims, and Plaintiffs endorse that decision. *Schmidt v. City of Norfolk*, Civil Action No. 2:24-cv-621, 2025 U.S. Dist. LEXIS 21096, at *5 (E.D. Va. Feb. 5, 2025). Last year, a state trial court in Virginia likewise granted a motion to suppress APLR data on the same *Carpenter*-based theory Plaintiffs advance here. *Commonwealth v. Bell, Circuit Court of The City of Norfolk*, Case No. CR23001500-00; 01; 02, 2024 Va. Cir. LEXIS 77 (May 10, 2024).

14

Other authorities involving ALPRs have generally not reached the *Carpenter* question or not found it applicable to the facts before them. In *Commonwealth v. McCarthy*, 484 Mass. 493, 508, 142 N.E.3d 1090, 1105–06 (2020), the Massachusetts Supreme Court agreed that a citizen has "a constitutionally protected expectation of privacy in the whole of his public movements," and that interest "potentially could be implicated by the widespread use of ALPRs." The defendant had been identified by ALPRs covering two bridges on the way to and from Cape Cod. "With enough cameras in enough locations," the Court said, "the historic location data from an ALPR system in Massachusetts would invade a reasonable expectation of privacy and would constitute a search for constitutional purposes," and Massachusetts' policy of retaining the data for one year "certainly [was] long enough to warrant constitutional protection." *Id*. at 506. The Court erred, however, in limiting its analysis to a very narrow understanding of the facts before it, treating only the four cameras on the two bridges as relevant to the case before it, and ruling that the recording by those cameras alone was insufficient to offend the Fourth Amendment. *Id*. at 509.

Other courts confronting this question have similarly held the ALPR data used to convict the given defendant was not pervasive enough to trigger *Carpenter*. *See United States v. Yang*, 958 F.3d 851, 863 (9th Cir. 2020) (Bea, J., concurring) ("Despite its 5 billion total records, the LEARN database contained a single entry for the Yukon that Yang had rented"); *United States v. Rubin*, 556 F. Supp. 3d 1123, 1129–30 (N.D. Cal. 2021) ("although this ALPR database contained more

information about Rubin than the single entry at issue in Yang, and the precise volume of information is unknown, it is clear that the information was not remotely comparable to the 'detailed, encyclopedic' information at issue in Carpenter"); *United States v. Bowers*, No. 2:18-CR-00292-DWA, 2021 U.S. Dist. LEXIS 196899, at *10 (W.D. Pa. Oct. 11, 2021) ("This limited data collection does not even begin to approach the same degree of information as that gathered in Carpenter"); *Commonwealth v. Watkins*, 2021 Pa. Dist. & Cnty. Dec. LEXIS 2485 (Dec. 15, 2021) ("While this Court finds the practice of reading and compiling license plate information troubling, it determined that the facts in this case are insufficient to establish the use of an LPR as the equivalent of physically placing a GPS device on a car"); *United States v. Graham*, No. 21-645, 2022 U.S. Dist. LEXIS 163818, at *14 (D.N.J. Sep. 12, 2022) ("In this case, law enforcement's use of ALPR database limited to a single occurrence on a single day did not reveal private details of Defendant's life.").

Here, Plaintiffs are not challenging a single camera—or handful of cameras—that might have picked them up once or twice. Rather, the facts pled here establish precisely what *Carpenter* requires: a pervasive system of hundreds of cameras that follow them all around the Chicago area—and soon will follow them all around the State of Illinois—and store that data for months without a warrant, probable cause, reasonable suspicion, or any other standard. That is an unreasonable search under the Fourth Amendment.

16

## II. The decision below was in error.

The Court below attempted to distinguish *Carpenter* and *Leaders of the Beautiful Struggle*, but its reasoning fails. S.A. 16–18. For one, the Court below distinguished these cases on the theory that the data was fundamentally different, and that the "search" in *Carpenter* was the subpoena to the phone company, whereas here it was the government's own collection of the data.

But the data available to ISP is not so limited: Defendants have access to data from any other jurisdiction that uses the Vigilant database and shares the data as ISP does. One of Defendants' own citations below was a case where the FBI was using other Vigilant cameras in Cook County. *See United States v. Brown*, No. 19-cv-949, 2021 U.S. Dist. LEXIS 206153, at *3 (N.D. Ill. Oct. 26, 2021). In *Brown,* the court simply found that the data in the record was insufficient to prove the *Carpenter* dragnet because the record only reflected a handful of datapoints. Plaintiffs hope to clarify in discovery just what other data ISP has from what other jurisdictions—which might include many cameras in and around Cook County—but for now, at the pleadings stage, the aggregate data of the ALPRs is enough to constitute an unconstitutional search to overcome a motion to dismiss and to show the likelihood of success on the merits.

The Supreme Court in *Carpenter* could have looked at just the four specific data points the government used against Mr. Carpenter at trial, but it recognized that this was not the proper analysis. Rather it looked at the entirety of the data the government collected. The entire point of *Carpenter* is that the aggregation of data is different. The data in *Leaders of the Beautiful Struggle* lacked much of the

specificity of the data here—they couldn't actually run licenses plates against ownership records but just had a plane flying around recording the movements of car-shaped blobs. But as the Fourth Circuit explained that aggregation of blobs is enough, because if you put enough blobs together you get the equivalent data in *Carpenter*, since the constant recording of public movements provides all sorts of intimate details to those with no business knowing. 2 F.4th at 342.

The court below relied on the automobile search cases to hold that Plaintiffs had no privacy interest, S.A. 10–11, but those cases are based on the pre-*Carpenter* regime, under which public movements were for all practical purposes unprotected. *See, e.g., Knotts*, 460 U.S. at 281. A citizen may not have an expectation of privacy in the plate displayed on the car in any specific instance—but the aggregations of those detections together are a horse of a different color. An individual pulled over by law enforcement may not be entitled to complain that they looked up his vehicle registration, but the answer should be different if law enforcement records every location of that plate for months on end.

### III. This violation of Plaintiffs' privacy constitutes irreparable harm and satisfies the other preliminary injunction factors.

Unless enjoined, Defendants' mass surveillance system will continue to cause irreparable harm to Plaintiffs. First, Defendants' tracking of Plaintiffs violates Plaintiffs' constitutional rights, which alone constitutes manifest, irreparable harm. *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427

U.S. 347, 373 (1976))). And even if further demonstration of irreparable harm were required, such a requirement is surely met by evidence that Defendants' mass surveillance will burden Plaintiffs' and others' associational and expressive activity: Plaintiffs will be tracked wherever they go and will have to consider that and limit their activities to the extent they don't want them to be known to the government. This chilling effect on their associational freedoms and right to travel cannot be recompensed by a damages award at the end of this case.

Nor do plaintiffs have any adequate remedies at law. The damage suffered by the violation to Plaintiffs' privacy is not quantifiable and therefore damages are inadequate. *ACLU v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) ("the quantification of injury is difficult and damages are therefore not an adequate remedy") (quotation and citation omitted).

The public interest always favors the protection of constitutional rights—and the balance of equities here clearly favors injunctive relief. Plaintiffs' requested injunction is narrow: they ask that this Court order that Defendants be enjoined from accessing ALPR data unless they first obtain a warrant. There is no request at this stage that Defendants deactivate or remove the cameras—Plaintiffs simply ask that, as this case is litigated, Defendants observe the most basic requirements of constitutional process: conduct reasonable searches subject to a warrant. Government officials are not harmed by the issuance of a preliminary injunction which prevents the state from implementing a likely unconstitutional practice. *See Joelner v. Vill. of Wash. Park*, 378 F.3d 615, 620 (7th Cir. 2004) (government could

19

suffer "no irreparable harm" from being "prevented from enforcing an unconstitutional statute"); *see also Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) ("[A] state is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional."); *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (government "cannot suffer harm from an injunction that merely ends an unlawful practice"). Such a warrant requirement will not burden defendants—by definition, any criminal activity they have probable cause to investigate will allow them to use the data as this case goes forward. The only thing they will be prevented from doing is tracking innocent citizens like Plaintiffs—and if for whatever reason they have valid reason to investigate Plaintiffs, they can get a warrant.

Granting Plaintiffs' preliminary injunctive relief would appropriately balance the nature and quality of the intrusion on Plaintiffs' Fourth Amendment rights and the governmental interests at stake. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). Plaintiffs seek a preliminary injunction that allows data to be collected but not accessed without a warrant supported by probable cause. This adequately protects the public safety interest—in any instance where law enforcement has a legitimate reason to search for the historical whereabouts of someone, it can get approval. If the government cannot meet that standard, the Fourth Amendment requires that the public's right to be secure in their persons against unreasonable searches must take precedence.

Plaintiffs have met the requirements for a preliminary injunction, and this Court should reverse the decision below and enter a preliminary injunction providing that Defendants may only access the collected data after obtaining a warrant.

## IV. Plaintiffs have standing to challenge the warrantless use of the LEARN database.

The Court below correctly held that Plaintiffs have standing to challenge the use of ALPRs to track their physical movements but erred by finding they did not have standing to "to enjoin the warrantless use of the LEARN database." S.A. 7. Since Plaintiffs are unwilling to plead that they are criminals, the district court found that they couldn't show they would in fact be investigated. S.A. 7. But this view of standing would blow a hole right through the any protection for the privacy of citizens.

The district court objected that "plaintiffs face no greater risk of being 'searched,' than any other motorist in Cook County." S.A. 6. But the fact that the government is violating the rights of *everyone* in Cook County should not protect the government from scrutiny because they've made the violation of rights too ubiquitous to object to. The particularity requirement of standing requires that Plaintiffs have a personal injury they are directly experiencing—that injury is not undermined by the injury of others. The court below relied on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), where a criminal suspect subject to a chokehold could not show he would be put in a choke hold by police again—but whether or not the LAPD made a habit of using excessive force, there was no realistic scenario by which the media citizen

21

would be choked out by the police any time soon. But here ISP is putting every citizen with a car in that metaphorical chokehold *everyday*, *like clockwork*. Under the district court's theory, the government can track every citizen everywhere they go every day, and they will not be entitled to a warrant because they can't prove their high enough on the government's priority list to be arrested.

## V.     Defendants are not entitled to sovereign immunity.

Defendants attempted below to avoid scrutiny by invoking sovereign immunity, but this is not a suit for damages. "[A] federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law." *Quern v. Jordan*, 440 U.S. 332, 337 (1979). And *Ex Parte Young*, 209 U.S. 123 (1908), permits federal courts to enjoin state officials to conform their conduct to requirements of federal law. *Milliken v. Bradley*, 433 U.S. 267, 289 (1977). Injunctive relief against Defendant state officials Kelly, Pritzker, and Raoul is thus perfectly appropriate under 42 U.S.C. § 1983; sovereign immunity does not apply to these defendants. *MSA Realty Corp. v. Illinois*, 990 F.2d 288, 291 (7th Cir. 1993).

And Defendants did not even attempt to argue below that Defendant Kelly is entitled to any sort of immunity or that he is not an appropriate official-capacity defendant. Sovereign immunity is waivable, and even if Defendant Kelly were entitled to it—which he is not—he has waived it here, and the court is therefore obliged to reach the merits. "Unless the State raises the matter, a court can ignore it." *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998). Regardless of the merits of Defendants' claim of sovereign immunity for the agency which Kelly heads, the

22

Illinois State Police, Plaintiffs' claims and request for injunctive relief as to Defendant Kelly are appropriate.

The Court below dismissed defendants Pritzker and Raoul on the theory that the Eleventh Amendment bars Plaintiffs claims against them, because neither Pritzker nor Raoul have specific involvement in enforcing the Act. In essence, the idea is that injunctive relief against the Act's enforcement would apply only to Defendants Kelly and ISP, not to Pritzker and Raoul, because they supposedly have no official responsibilities under the Act. But Kelly and ISP work for the Governor and Attorney General, who have ultimate authority over their actions. Defendants Pritzker and Raoul each are proper parties under *Ex Parte Young* because they are the officials responsible for overseeing and managing the implementation of the challenged policies of the Act.

In *Doe v. Holcomb*, 883 F.3d 971, 975 (7th Cir. 2018), the immigrant plaintiff challenged Indiana's name-change statute, which he was unable to take advantage of because it required proof of United States citizenship, and he was not a citizen. This Court pointed out that the plaintiff had not sued the governor in his capacity as head of the State Bureau of Motor Vehicles, whose policy based on the name-change statute was denying the plaintiff the ID with his preferred name: "Doe may have been able to overcome the Eleventh Amendment had he sued the Governor to enjoin the enforcement of the BMV's requirements. Instead, Doe sued the Governor in his official capacity to prevent him from enforcing the name-change statute." *Holcomb*, 883 F.3d at 976. This case is like the Seventh Circuit's hypothetical:

Plaintiffs did not sue the Governor and Attorney General to prevent them from enforcing the Tamera Clayton Expressway Cameras Act. Rather, Plaintiffs' Complaint asks this court to enjoin the implementation of the Act and the ongoing operation of the ALPRs by ISP. Just as the Indiana Governor in Holcomb was the head of the Bureau of Motor Vehicles, here the Illinois Governor is the state official who has final authority over the policies and practices of ISP—he appoints the director, who reports to him—and the Attorney General of Illinois is the chief law enforcement officer of the state responsible for overseeing the criminal investigations and prosecutions derived from this unconstitutional surveillance. Both have a direct role to play in and direct authority over the operation of the challenged program, and therefore are appropriate parties under *Ex Parte Young*. *See Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 645 (7th Cir. 2006) (noting that "it is not necessary that the officer's enforcement duties be noted in the act") (quoting *In re Dairy Mart Convenience Stores Inc.*, 411 F.3d 367, 373 (2d Cir. 2005)). Eleventh Amendment sovereign immunity does not apply to Defendants Pritzker and Raoul, and the injunctive relief sought by Plaintiffs is appropriately applied against them.

## Conclusion

For the foregoing reasons, this Court should reverse the district court's judgment in full: reversing the district court's dismissal of the complaint and granting a preliminary injunction requiring Defendants to obtain a warrant before accessing ALPR data.

24

Dated: August 25, 2025

/s/ Jeffrey M. Schwab
Jeffrey M. Schwab
Reilly Stephens
Brendan Philbin
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org
rstephens@ljc.org

*Attorneys for Plaintiff-Appellant*

**Certificate of Compliance**

I certify that this brief conforms to the type-volume limitations imposed by Fed. R. App. P. 32 and Circuit Rule 32 for a brief produced using the following font: Proportional Century Schoolbook Font 12-point for body text, 11-point for footnotes. Microsoft Word for Mac was used. The length of this brief was 6,456 words.

/s/ Jeffrey M. Schwab
Jeffrey Schwab

**Certificate of Service**

I hereby certify that on August 25, 2025, I electronically filed the foregoing Appellants' Brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Jeffrey M. Schwab
Jeffrey Schwab

# Required Short Appendix

*Contents*

District Court Memorandum Opinion and Order ............................................S.A. 1

District Court Judgment ...........................................................................S.A. 19

District Court Docket Entry dated March 31, 2025 ....................................S.A. 21

District Court Docket Entry dated May 2, 2025 ..........................................S.A. 22

Complaint ................................................................................................S.A. 23

*Certificate*

  Pursuant to Circuit Rule 30(d), I hereby certify that this short appendix includes all the materials required by Circuit Rules 30(a) and (b).

          /s/ Jeffrey M. Schwab

          Counsel for Plaintiffs-Appellants

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| STEPHANIE SCHOLL, <br><br> FRANK BEDNARZ, <br><br>       Plaintiffs, <br><br>         v. <br><br> ILLINOIS STATE POLICE, <br><br> BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police, <br><br> JAY R. PRITZKER, in his official capacity as Governor of Illinois, <br><br> KWAME RAOUL, in his official capacity as Attorney General of Illinois <br><br>       Defendants. | Case No. 24-cv-4435 <br><br> Judge Martha M. Pacold |

**MEMORANDUM OPINION AND ORDER**

This case presents a Fourth Amendment challenge to Illinois's automatic license plate reader program. Plaintiffs Stephanie Scholl and M. Frank Bednarz live and drive in Cook County, Illinois. *Id.* ¶¶ 5–6. Defendants are Illinois Governor Jay R. Pritzker, Illinois Attorney General Kwame Raoul, Illinois State Police Director Brendan F. Kelly, and the Illinois State Police. *Id.* ¶¶ 7–10. All defendants are sued in their official capacities. *Id.* ¶ 11.

Plaintiffs bring this suit under 42 U.S.C. § 1983, claiming that defendants violated their Fourth Amendment rights. Plaintiffs move for a preliminary injunction. [14]. Defendants move to dismiss the complaint under Rule 12(b)(1), for lack of subject-matter jurisdiction, and Rule 12(b)(6), for failure to state a claim. [22]. For the reasons stated below, plaintiffs' motion for a preliminary injunction is denied, and defendants' motion to dismiss is granted.

S.A. 1

## BACKGROUND

At the pleading stage, the court "accept[s] all well-pleaded factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).

Six years ago, United States Postal Service worker Tamara Clayton was fatally shot on the I-57 highway. [1] ¶ 14.[1] "This unfortunate expressway shooting sparked a movement within the community, Illinois State Police (ISP), Illinois Department of Transportation (IDOT), local police agencies, and the Governor's office." *See Ill. State Police, Automated License Plate Reader – Transparency Page*, https://isp.illinois.gov/CriminalInvestigations/TransparencyPage (last visited March 31, 2025).[2] On January 1, 2020, Illinois enacted the Tamara Clayton Expressway Camera Act to fund the installation of approximately 300 cameras—known as "automated license plate readers" or "ALPRs"—across Cook County expressways. [1] ¶ 15; *see* 605 ILCS 140/1 *et seq*. Two years later, Illinois passed a statute appropriating additional funds and extending the program to twenty other counties. *Id.* ¶ 22. To date, the Illinois State Police has installed 344 cameras in Cook County, 78 in St. Clair County, and 44 across 17 other counties.[3]

This surveillance program works in two steps. Installed on the side of a road, ALPRs photograph (or "detect") the license plates of vehicles driving by. [1] ¶ 16. The system then uploads the photo to the Law Enforcement Archival Reporting Network ("LEARN") database. *Id.* ¶ 31. This national database compiles and stores billions of license plate photos taken by ALPRs in Illinois and elsewhere. *Id.* ¶ 32.

Law enforcement agencies across the country flag "hot plates" of vehicles that are targets of investigation—for instance, if the car is reported stolen, is used as the getaway vehicle in a bank robbery, or has expired registration. *Id.* ¶ 27. License plate photos sit idle in the database until there is a "hit"—when an ALPR "detects" a hot plate. *Id.* ¶¶ 27–28. When police receive notification of the hit, they can enter the LEARN database to retrieve the license plate photo and associated metadata of when and where the photo was taken. *Id.* This information allows police to "see what cars passed by that area at the relevant time and to whom those vehicles are registered."

---

[1] Bracketed numbers refer to docket entries and are followed by page or paragraph number citations. Page numbers refer to the CM/ECF page number.

[2] This webpage is cited throughout the complaint. [1] ¶¶ 15, 21–23; *see Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (explaining that the court may consider "documents that are critical to the complaint and referred to in it").

[3] *See Ill. State Police, Automated License Plate Reader Statistics Dashboard*, https://isp.maps.arcgis.com/apps/dashboards/77d1b36b7d9f419289cffe58d8ac9e54 (referenced in [1] ¶¶ 24–28).

2

*Id.* ¶¶ 16, 19. Last month, ALPRs in Illinois recorded 200,161,762 detections and 5,747,483 hits.[4]

Under the Expressway Camera Act, an Illinois State Police officer may retrieve a license plate photo from the database to investigate "any offenses involving vehicular hijacking, aggravated vehicular hijacking, terrorism, motor vehicle theft, or any forcible felony, including, but not limited to, offenses involving the use of a firearm[.]" 605 ILCS 140/5(b). They may also retrieve a photo "to detect expressway hazards and highway conditions; and to facilitate highway safety and incident management." *Id.* By statute, "[a]ll images from the cameras shall be deleted" from the LEARN database "within 120 days, unless the images are relevant to an ongoing investigation or pending criminal trial." *Id.*

Plaintiffs challenge the Expressway Camera Act and Illinois's warrantless use of ALPRs as unconstitutional under the Fourth Amendment. They bring this challenge under 42 U.S.C. § 1983, seeking injunctive relief and attorneys' fees—but not compensatory damages.

Plaintiffs also ask the court to preliminarily enjoin defendants "from accessing ALPR data unless they first obtain a warrant"—in other words, to order defendants to obtain a warrant before they enter the LEARN database to retrieve information about a "hot plate." [15] at 13. Plaintiffs have not asked the court to preliminarily compel defendants to "deactivate or remove the cameras." *Id.* In short, the requested preliminary injunction does not target the process of "detection," but the process of following up on a "hit." The requested *permanent* injunction, by contrast, seeks to enjoin both—the warrantless use of ALPRs (the process of "detection") *and* the LEARN database (the process of following up on a "hit").

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) permits a party to move for dismissal due to lack of subject-matter jurisdiction. In evaluating a motion under Rule 12(b)(1), the court must first determine whether the motion raises a factual or facial challenge to subject-matter jurisdiction. *See Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). Here, defendants have raised a facial challenge to subject-matter jurisdiction, contending that the complaint does not sufficiently allege a basis for subject-matter jurisdiction. *See id.* ("[A] facial challenge argues that the plaintiff has not sufficiently 'alleged a basis of subject matter jurisdiction.'" (quotation omitted)). Courts adjudicating facial challenges to subject-matter jurisdiction "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Id.*

---

[4] *See Ill. State Police, Automated License Plate Reader Statistics Dashboard*, https://isp.maps.arcgis.com/apps/dashboards/77d1b36b7d9f419289cffe58d8ac9e54.

Next, Rule 12(b)(6) permits the defendant to move for dismissal on the merits—for failure to state a claim. In evaluating a motion to dismiss under Rule 12(b)(6), the court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[N]aked assertion[s] devoid of further factual enhancement" are insufficient. *Id.* (quoting *Twombly*, 550 U.S. at 557).

Last, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The two most important considerations are likelihood of success on the merits and irreparable harm." *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023).

## DISCUSSION

### I.     Threshold Objections

Defendants raise a series of threshold objections. First, they argue that plaintiffs lack an injury-in-fact sufficient to confer Article III standing. Next, they argue that plaintiffs' claims violate the rule against third-party standing. Finally, they argue that the claims against certain defendants are barred by sovereign immunity. The court will address each objection in turn.

### A.     Injury-in-Fact

Article III "confines" federal jurisdiction "to 'Cases' and 'Controversies.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). One aspect of the Case or Controversy requirement is the doctrine known as "standing." Standing requires a plaintiff to "have a 'personal stake' in the case." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). This "irreducible constitutional minimum . . . contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Those elements are an "injury in fact, a causal connection between the injury and the defendant's conduct, and likely redressability through a favorable decision." *Winkler v. Gates*, 481 F.3d 977, 979 (7th Cir. 2007). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

Injury-in-fact is the "[f]irst and foremost" requirement. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. at 103. This requirement must be satisfied "separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). Depending on what relief is sought, the alleged injury must be either "actual" or "imminent"—in other words, it "must have already occurred or be likely to occur

S.A. 4

soon." *All. for Hippocratic Med.*, 602 U.S. at 381. A plaintiff seeking only retrospective damages may rely solely on past injuries. However, only "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief." *TransUnion*, 594 U.S. at 435; *see Lyons*, 461 U.S. at 109.

Here, plaintiffs seek forward-looking, injunctive relief.[5] *See* [1] ¶¶ 49A–C. To establish standing, they must demonstrate a risk of future harm that is "sufficiently imminent and substantial." *TransUnion*, 594 U.S. at 436. While the "threatened injury" need not be "literally certain," it must be "certainly impending." *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 410, 414 n.5 (2013) (quotation omitted); *see Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (explaining that there must be "a substantial risk that the harm will occur" (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

### 1.      Use of ALPRs

First, plaintiffs seek to enjoin the warrantless use of ALPRs to photograph motorists' license plates. As alleged, plaintiffs "regularly drive[] on the expressways in Cook County and the surrounding area, almost always using the same personal vehicle, including commuting from [their] home[s] in Cook County to work in the Chicago suburbs, as well as regular other trips by car in areas covered by Illinois' ALPR system." [1] ¶¶ 5–6. With "some 300 ALPR cameras across every expressway in Cook County," *id.* ¶ 15, one can reasonably infer that those cameras will photograph plaintiffs' license plates.

Indeed, courts routinely hold that the subjects of government surveillance have standing to challenge that surveillance. *See, e.g., Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 209 (4th Cir. 2017); *Schuchardt v. President of the U.S.*, 839 F.3d 336, 344–46 (3d Cir. 2016); *Am. C.L. Union v. Clapper*, 785 F.3d 787, 801–02 (2d Cir. 2015). "Whether or not such claims prevail on the merits, [plaintiffs] surely have standing to allege injury from the collection, and maintenance in a government database, of records relating to them." *Am. C.L. Union*, 785 F.3d at 801.

Defendants argue that plaintiffs' alleged injuries are not legally cognizable because plaintiffs' asserted privacy interests are not protected by the Fourth Amendment. [32] at 7. Defendants point to the Supreme Court's remark in *Byrd v. United States*, 584 U.S. 395 (2018), that "[t]he concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search." *Id.* at 410. But in a portion of that same sentence (which defendants elide), the *Byrd* Court clarified that Fourth Amendment

---

[5] Plaintiffs also request attorneys' fees, presumably under 42 U.S.C. § 1988. [1] ¶ 49D. That alone does not confer standing. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 272 (2021) ("A request for attorney's fees or costs cannot establish standing because those awards are merely a 'byproduct' of a suit that already succeeded, not a form of redressability.").

standing "should not be confused with Article III standing." *Id.* Thus, with respect to Fourth Amendment cases, *Byrd* does not abrogate the ordinary rule that the Article III standing inquiry is distinct from the merits inquiry. *See, e.g., Pearson v. Target Corp.*, 968 F.3d 827, 835 (7th Cir. 2020). The court must, as in other cases, "assume that the party asserting federal jurisdiction is correct on the legal merits of his claim" and "that a decision on the merits would be favorable." *Hassan v. City of New York*, 904 F.3d 277, 289 (3d Cir. 2015) (quoting *Cutler v. U.S. Dep't of Health & Hum. Servs.*, 797 F.3d 1173, 1179 (D.C. Cir. 2015)).[6]

### 2.    Use of the LEARN Database

Second, plaintiffs seek to enjoin the warrantless use of the LEARN database. *See* [15] at 13. However, the complaint does not allege any facts indicating a "substantial risk" that police will soon retrieve plaintiffs' license plate information from the database. *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper v. Amnesty Int'l*, 568 U.S. at 414 n.5). Plaintiffs do not allege any "intention to engage in a course of conduct" that might render their license plates relevant to a criminal investigation. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Indeed, plaintiffs do not allege that they will soon commit (or be victims of) any of the offenses enumerated in the Expressway Camera Act—namely, "vehicular hijacking, aggravated vehicular hijacking, terrorism, motor vehicle theft, or any forcible felony[.]" 605 ILCS 140/5. Nor do plaintiffs allege that they will soon cause (or be subject to) "expressway hazards," such that their license plate information will be useful for "facilitat[ing] highway safety and incident management." *Id.* Absent additional allegations along these lines, plaintiffs face no greater risk of being "searched" than any other motorist in Cook County. *See Lyons*, 461 U.S. at 111 ("Absent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional.").

As alleged, defendants are "holding onto . . . mass surveillance data in case one day some police officer decides to target Plaintiffs for specific investigation." [1] ¶ 40. While "one day" need not be today or tomorrow, it must be some ascertainable time. *See Lujan*, 504 U.S. at 565 (explaining that "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases

---

[6] Defendants' attempt to characterize plaintiffs' alleged constitutional injuries as abstract generalized grievances, [23] at 13, 15, is not persuasive. Plaintiffs allege violations of their Fourth Amendment right to be secure against "unreasonable" searches—a harm "specified by the Constitution itself." *TransUnion*, 594 U.S. at 426. The bare fact that a harm is "widely shared" is insufficient to negate standing. *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998).

require"). Because their alleged constitutional injuries are not sufficiently imminent, plaintiffs lack standing to enjoin the warrantless use of the LEARN database.

## B.      Third-Party Standing

Defendants also frame plaintiffs' claim for injunctive relief as a claim brought "on behalf of third parties, which here appear[] to be every Illinois citizen." [23] at 17. Citing the principle that plaintiffs generally "cannot rest [their] claim[s] to relief on the legal rights or interests of third parties," *Warth v. Seldin*, 422 U.S. 490, 499 (1975), defendants argue that plaintiffs lack standing to enjoin the implementation of the Expressway Camera Act.

This argument is unpersuasive. Plaintiffs do not purport to assert the legal rights and interests of third parties; they assert their own. Because plaintiffs allege that the warrantless use of automated license plate readers infringes *their* right to be secure against unreasonable searches and seizures, [1] ¶ 49, their claims do not implicate the rule against third-party standing. *Cf. Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) ("Fourth Amendment rights are personal rights . . . ." (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)).[7]

## C.      Sovereign Immunity

Next, defendants move to dismiss plaintiffs' claims on sovereign immunity grounds. Sovereign immunity "bars actions in federal court against a state, state agencies, or state officials acting in their official capacities"—whether for damages or injunctive relief. *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 520 (7th Cir. 2021) (quotation omitted); *see Cory v. White*, 457 U.S. 85, 91 (1982) (explaining that sovereign immunity bars suits against the state for injunctive relief). Suits against state officials in their official capacity amount to suits against the state itself. *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

"A narrow exception to sovereign immunity, though, 'allows suits . . . for declaratory or injunctive relief against state officers in their official capacities.'" *Sherwood v. Marchiori*, 76 F.4th 688, 693 (7th Cir. 2023) (quoting *Reed v. Goertz*, 598 U.S. 230, 234 (2023)). "The *Ex parte Young* doctrine 'allows private parties to sue individual state officials for prospective relief to enjoin ongoing violations of federal law.'" *Council 31 of the Am. Fed'n of State, Cnty., and Mun. Emps., AFL-CIO v. Quinn*, 680 F.3d 875, 882 (7th Cir. 2012) (quotation omitted); *see also Ex parte Young*, 209

---

[7] To be sure, plaintiffs' requested injunction would affect defendants' investigative actions against third parties. But even if the court were to find such broad relief inappropriate, that would not divest the court of jurisdiction to issue more focused relief to redress plaintiffs' own injuries. *See City of Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020). Thus, it does not undermine plaintiffs' standing to challenge the ALPR program, at least as applied to them. *Cf. Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 803 (7th Cir. 2016).

7

U.S. 123 (1908). Plaintiffs seek to proceed under that doctrine. To do so, plaintiffs must show that "the named state officials are connected with the enforcement" of the allegedly unconstitutional statute, such that their "connection to the enforcement of the [challenged] statute is sufficiently intimate to meet the requirements of *Ex parte Young*." *Doe v. Holcomb*, 883 F.3d 971, 976–77 (7th Cir. 2018) (quotation omitted).

With respect to Governor Pritzker, plaintiffs allege that he "is responsible for enacting and implementing the surveillance policy challenged in this case," [1] ¶ 9, and has "ultimate authority" over the "policies and practices" of the Illinois State Police, [28] at 3. These nonspecific allegations do not pierce sovereign immunity. Plaintiffs do not specify Governor Pritzker's role in the enforcement of the Expressway Camera Act. Indeed, based on the allegations in the complaint, "the Governor was not specifically charged with a duty to enforce the" challenged statute, "and he has not taken on any duty to enforce it either." *Doe*, 883 F.3d at 976. "[T]he mere fact that a governor is under a general duty to enforce state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute." *Id.* (quotation omitted). Absent specific allegations of Governor Pritzker's personal involvement in the enforcement of the challenge statute, plaintiffs cannot subject him to suit under *Ex parte Young. See Ill. League of Advocates for the Developmentally Disabled v. Quinn*, No. 13-CV-1300, 2013 WL 5548929, at *4 (N.D. Ill. Oct. 8, 2013) ("A theory of liability predicated on a governor's general obligations as the executive of the State cannot avoid the consequences of the Eleventh Amendment." (citations omitted)).

Turning to Attorney General Raoul, plaintiffs allege that he "is responsible for enforcing and defending the laws of the state of Illinois," [1] ¶ 10, and serves as "the chief law enforcement officer of the state responsible for overseeing the criminal investigations and prosecutions derived from this unconstitutional surveillance." [28] at 3. This nonspecific recitation of the Attorney General's job description does not pierce sovereign immunity. "Plaintiffs have not articulated any theory under which *Ex parte Young* supports a suit against the Attorney General, who has never threatened [them] with prosecution," and apparently "has no authority to do so." *Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*, 980 F.2d 437, 441 (7th Cir. 1992) (noting that "States' Attorneys, elected in each county, are the public prosecutors in Illinois"); *see also Whole Woman's Health v. Jackson*, 595 U.S. 30, 43 (2021) ("While *Ex parte Young* authorizes federal courts to enjoin certain state officials from enforcing state laws, the petitioners do not direct this Court to any enforcement authority the attorney general possesses in connection with [the challenged statute] that a federal court might enjoin him from exercising."). Because the complaint does not specify how Attorney General Raoul is personally involved in the enforcement of the Expressway Camera Act, he cannot be sued under § 1983.

Indeed, plaintiffs' attempt to sue Governor Pritzker and Attorney General Raoul under *Ex parte Young* is foreclosed by *Ex parte Young* itself. In that case, the Supreme Court explained:

8

> If, because they were law officers of the state, a case could be made for the purpose of testing the constitutionality of the statute, by an injunction suit brought against them, then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former, as the executive of the state, was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the state in litigation involving the enforcement of its statutes. That would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law which may be raised by individuals, but it is a mode which cannot be applied to the states of the Union consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit of private persons.

> In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.

209 U.S. at 157 (internal quotation marks omitted). Accordingly, Governor Pritzker and Attorney General Raoul are dismissed.

*Ex parte Young* extends only to official capacity suits against "state officials," *Malhotra v. Univ. of Ill. at Urbana-Champaign*, 77 F.4th 532, 536 n.3 (7th Cir. 2023), not to suits against "the State or one of its agencies or departments," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (explaining that sovereign immunity bars such suits "in the absence of [the State's] consent" to be sued). *See also P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (explaining that *Ex parte Young* "has no application in suits against the States and their agencies"). Because the Illinois State Police is a department of the state of Illinois, and because it has not consented to this suit, it is dismissed.

Director Kelly does not invoke sovereign immunity. Indeed, he admitted at oral argument that this suit may proceed against him as the sole remaining defendant. Thus, the court proceeds to the merits of plaintiffs' Fourth Amendment challenge to the use of ALPRs.

## II. Fourth Amendment

"The Fourth Amendment provides in relevant part that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" *Collins v. Virginia*, 584 U.S. 586, 591 (2018). "[A]utomobiles are 'effects' and thus within the reach of the Fourth

Amendment." *South Dakota v. Opperman*, 428 U.S. 364, 367 (1976) (citation omitted). And "warrantless searches are presumptively unconstitutional." *Kyllo v. United States*, 533 U.S. 27, 32 (2001). However, "not all investigative actions are 'searches' subject to Fourth Amendment scrutiny." *United States v. Soybel*, 13 F.4th 584, 590 (7th Cir. 2021). Rather, "[t]he word 'search' is a term of art in Fourth Amendment analysis." *United States v. Shelton*, 997 F.3d 749, 758 n.2 (7th Cir. 2021).

"The Supreme Court has developed two distinct paths to identify a search[.]" *United States v. Tuggle*, 4 F.4th 505, 512 (7th Cir. 2021). First, "[u]nder the property-based approach, a search occurs when an officer enters a constitutionally protected area . . . for the purpose of gathering evidence against the property owner." *United States v. Lewis*, 38 F.4th 527, 533–34 (7th Cir. 2022) (citing *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). "Alternatively, under the privacy-based approach, courts ask whether a person has a legitimate expectation of privacy in a given situation." *Id.* at 534 (citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). Because plaintiffs do not argue that the ALPR program involves a physical intrusion on their property, the court will examine their Fourth Amendment challenge under the privacy-based approach.

"To determine whether someone has a legitimate expectation of privacy, courts must consider (1) whether that person, by his conduct, has exhibited an actual, subjective expectation of privacy and (2) whether his expectation of privacy is one that society is prepared to recognize as reasonable." *United States v. Sawyer*, 929 F.3d 497, 499 (7th Cir. 2019); *see California v. Ciraolo*, 476 U.S. 207, 211 (1986). Recognizing, however, that "constitutional rights are not generally defined by the subjective intent of those asserting the rights," the Supreme Court "has always emphasized the second of these two requirements." *Hudson v. Palmer*, 468 U.S. 517, 525 n.7 (1984); *see Tuggle*, 4 F.4th at 514.

The Fourth Amendment—as interpreted by *Katz* and its progeny—"limits the government's ability to exploit technological advances." *Lewis*, 38 F.4th at 534 (citing *Kyllo*, 533 U.S. at 34–35). But "[a]s long as the government moves discreetly with the times, its use of advanced technologies will likely not breach society's reconstituted (non)expectations of privacy." *Tuggle*, 4 F.4th at 510; *see also Kyllo*, 533 U.S. at 33–34 ("It would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology.").

Applying these principles, the court concludes that, when an ALPR scans a license plate, it does not conduct a "search" and thus does not trigger Fourth Amendment scrutiny. *See Illinois v. Caballes*, 543 U.S. 405, 408 (2005) ("Official conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment.").

First, "no privacy interest exists in license plates." *United States v. Walraven*, 892 F.2d 972, 974 (10th Cir. 1989); *see also United States v. Evans*, 27 F.3d 1219,

1228 (7th Cir. 1994). Indeed, the Supreme Court has "commented more than once on the diminished expectation of privacy in an automobile." *United States v. Knotts*, 460 U.S. 276, 281 (1983); *see, e.g., Opperman*, 428 U.S. at 367; *New York v. Class*, 475 U.S. 106, 112–13 (1986); *Cardwell v. Lewis*, 417 U.S. 583, 590 (1974) (plurality opinion); *see also United States v. Plancarte*, 105 F.4th 996, 1000 (7th Cir. 2024). That does not mean that "[a]n individual operating or traveling in an automobile . . . lose[s] all reasonable expectation of privacy." *Delaware v. Prouse*, 440 U.S. 648, 662 (1979); *accord Class*, 475 U.S. at 112 ("A citizen does not surrender all the protections of the Fourth Amendment by entering an automobile."). However, because "[t]he exterior of a car . . . is thrust into the public eye, . . . to examine it does not constitute a 'search.'" *Class*, 475 U.S. at 114.

"The factors that generally diminish the reasonable expectation of privacy in automobiles are applicable *a fortiori* to" license plates. *See id.* at 113. Illinois law requires vehicles to display two license plates—one on the front and one on the rear, both in a "position to be clearly visible" and "free from any materials that would obstruct the visibility of the plate." 625 ILCS 5/3-413(a); *see also Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 212 (2015) (explaining that "license plates are, essentially, government IDs"). And "it is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile." *Class*, 475 U.S. at 114.

Plaintiffs, of course, are concerned less with the license plates themselves and more with what the ALPR data reveals about their movements. But "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Knotts*, 460 U.S. at 281. "What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351. As *Knotts* observed, when a criminal suspect "travelled over the public streets he voluntarily conveyed to anyone who wanted to look the fact that he was travelling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property." 460 U.S. at 281–82; *Cardwell*, 417 U.S. at 590 ("A car has little capacity for escaping public scrutiny. It travels public thoroughfares where its occupants and its contents are in plain view.").

*Knotts*, however, noted that "if such dragnet type law enforcement practices as respondent envisions should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable." 460 U.S. at 284; *see Carpenter v. United States*, 585 U.S. 296, 306 (2018) ("This Court in *Knotts*, however, was careful to distinguish between the rudimentary tracking facilitated by the beeper and more sweeping modes of surveillance."). Accordingly, plaintiffs argue that the ALPR program violates their "privacy interest in the *whole* of their physical movements." [15] at 4 (emphasis added); *see Carpenter*, 585 U.S. at 310 ("[I]ndividuals have a reasonable expectation of privacy in the whole of their physical movements.").

S.A. 11

Plaintiffs' argument resembles the "mosaic" theory of the Fourth Amendment—"the idea that the 'government can learn more from a given slice of information if it can put that information in the context of a broader pattern, a mosaic.'" *United States v. House*, 120 F.4th 1313, 1318 (7th Cir. 2024) (quoting Matthew S. Kugler & Lior Jacob Strahilevitz, *Actual Expectations of Privacy, Fourth Amendment Doctrine, and the Mosaic Theory*, 2015 Sup. Ct. Rev. 205, 205 (2015)). In other words, the mosaic theory "asks 'whether a set of nonsearches aggregated together amount to a search because their collection and subsequent analysis creates a revealing mosaic.'" *Id.* at 1319 (quoting Orin S. Kerr, *The Mosaic Theory of the Fourth Amendment*, 111 Mich. L. Rev. 311, 320 (2012)). Under this theory, even if no single act of surveillance constitutes a search, the aggregation of information obtained through the surveillance program may nevertheless amount to a search. *See id.* ("[W]hile isolated pole camera surveillance would not offend the Fourth Amendment under the mosaic theory, surveillance that captures enough information to create a comprehensive account of a suspect's movements could."); *United States v. Maynard*, 615 F.3d 544, 562 (D.C. Cir. 2010) ("Prolonged surveillance reveals types of information not revealed by short-term surveillance, such as what a person does repeatedly, what he does not do, and what he does ensemble. These types of information can each reveal more about a person than does any individual trip viewed in isolation."), *aff'd sub nom. United States v. Jones*, 565 U.S. 400 (2012).

"Despite garnering passing endorsement from some—if not most—of the justices in the various opinions in *Jones, Riley* [*v. California*, 573 U.S. 373 (2014)], and *Carpenter*, the theory has not received the [Supreme] Court's full and affirmative adoption." *Tuggle*, 4 F.4th at 519–20; *see House*, 120 F.4th at 1319–20 ("[T]he mosaic theory has been discussed but not adopted by the Supreme Court."). And the Seventh Circuit has expressed skepticism about the theory. *See House*, 120 F.4th at 1319 (declining to apply the mosaic theory); *Tuggle*, 4 F.4th at 520 ("[M]any courts that have considered the theory have expressed disapproval . . . ." (footnote omitted)); *see also United States v. Cuevas-Perez*, 640 F.3d 272, 276–86 (7th Cir. 2011) (Flaum, J., concurring), *vacated*, 565 U.S. 1189 (2012). Rather than rely on abstract theories, the Seventh Circuit compares the challenged surveillance program to the surveillance methods tested in earlier cases. *See United States v. Hammond*, 996 F.3d 374, 389 (7th Cir. 2021) ("Given that *Carpenter* disclaimed providing any answer to the question before us, we consider whether the facts of this case are more similar to *Carpenter* or to *Knotts*."). The court will do the same.

The first relevant case is *Knotts*, 460 U.S. 276. As the Supreme Court later summarized:

> In *United States v. Knotts*, law enforcement officials, with the consent of the seller, installed a beeper in a 5-gallon can of chloroform and monitored the beeper after delivery of the can to the buyer in Minneapolis, Minn. Although there was partial visual surveillance as the automobile containing the can moved along the public highways, the

beeper enabled the officers to locate the can in the area of a cabin near Shell Lake, Wis., and it was this information that provided the basis for the issuance of a search warrant. . . . The Court held that since the movements of the automobile and the arrival of the can containing the beeper in the area of the cabin could have been observed by the naked eye, no Fourth Amendment violation was committed by monitoring the beeper during the trip to the cabin.

*United States v. Karo*, 468 U.S. 705, 713–14 (1984) (citation omitted).

In *Karo*, the Court distinguished *Knotts*, holding that warrantless "monitoring of a beeper in a private residence, a location not open to visual surveillance, violates the Fourth Amendment" because "the monitoring indicated that the beeper was inside the house," thus "reveal[ing] a critical fact about the interior of the premises that the Government is extremely interested in knowing and that it could not have otherwise obtained without a warrant." *Id.* at 714–15; *cf. Kyllo*, 533 U.S. at 34 ("We think that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area constitutes a search—at least where (as here) the technology in question is not in general public use." (citation omitted)).

Next is a line of cases addressing GPS tracking of vehicles. The key case is *Jones*, where the Supreme Court held "that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" within the meaning of the Fourth Amendment. 565 U.S. at 404 (footnote omitted). The *Jones* majority relied on the property-based approach, not the *Katz* privacy-based approach. *See id.* at 404–11; *Carpenter*, 585 U.S. at 307 ("The Court decided the case based on the Government's physical trespass of the vehicle."). While the majority acknowledged that "[s]ituations involving merely the transmission of electronic signals without trespass would *remain* subject to *Katz* analysis," it declined to decide whether the challenged GPS monitoring was also a "search" under *Katz*. *Jones*, 565 U.S. at 406, 412, 411.

"Four concurring justices would have examined the case solely under" *Katz*. *United States v. Gutierrez*, 760 F.3d 750, 756 (7th Cir. 2014) (citing *Jones*, 565 U.S. at 419 (Alito, J., concurring in the judgment)). Writing for these justices, Justice Alito explained:

Under [*Katz*], relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable. But the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy. For such offenses, society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single

13

movement of an individual's car for a very long period. In this case, for four weeks, law enforcement agents tracked every movement that respondent made in the vehicle he was driving. We need not identify with precision the point at which the tracking of this vehicle became a search, for the line was surely crossed before the 4-week mark. Other cases may present more difficult questions.

*Id.* at 430 (citation omitted).

Though joining the majority, Justice Sotomayor wrote separately to explain that she agreed with Justice Alito "that, at the very least, 'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.'" *Id.* at 415 (Sotomayor, J., concurring) (quoting *id.* at 430 (Alito, J., concurring in the judgment)). Thus, "five Justices agreed that longer term GPS monitoring of even a vehicle traveling on public streets constitutes a search." *Carpenter*, 585 U.S. at 314–15.[8]

That leads to the Supreme Court's landmark decision in *Carpenter*—the case on which plaintiffs' argument chiefly rests. In *Carpenter*, the Court considered "whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements." 585 U.S. at 296. Invoking the Stored Communications Act, the Government obtained seven days of cell-site location information (CSLI) from Carpenter's wireless carrier. *Id.* at 310 n.3. CSLI "is the location information generated by a cell phone. When the phone is powered on, it sends and receives signals from the cell tower with the strongest signal; that cell tower is usually the

---

[8] Before *Jones*, the Seventh Circuit—relying principally on *Knotts*—held "that installation of a GPS device, and the use of the location data it produces, are not within the scope of the [F]ourth [A]mendment"—"no matter how long [the] tracking lasts." *United States v. Brown*, 744 F.3d 474, 476–477 (7th Cir. 2014); *see Cuevas-Perez*, 640 F.3d 272 (explaining that GPS tracking of a suspect for 60 hours is not a search under *Katz*); *United States v. Garcia,* 474 F.3d 994, 996–97 (7th Cir. 2007). *Knotts*, in turn, "addressed only the [*Katz* test], since the [property-based approach] was not at issue." *Jones*, 565 U.S. at 409. And the majority in "*Jones* did not hold . . . that monitoring a car's location for an extended time is a search even if . . . no property rights have been invaded." *Brown*, 744 F.3d at 476. Thus, holding that non-trespassory GPS tracking constitutes a search would require "an extension of *Jones*" that the Seventh Circuit has not yet embraced. *Id.*

It is thus unclear after *Jones* whether GPS monitoring invades a reasonable expectation of privacy. The Seventh Circuit's pre-*Jones* analyses may remain good law on the *Katz* question, even though *Jones* applied the property-based approach to reject their bottom-line conclusions. However, because a Supreme Court majority has since favorably cited the *Jones* concurrences, *see Carpenter*, 585 U.S. at 307, 309, 311–14, the court will assume for argument's sake that the GPS tracking in *Jones* invaded a reasonable expectation of privacy and was thus a "search" under *Katz*.

one closest to the phone." *United States v. Rosario*, 5 F.4th 706, 709 (7th Cir. 2021) (footnote omitted). The CSLI at issue in *Carpenter* included "an average of 101 data points per day." 585 U.S. at 302. The cell phone collected this data "by dint of its operation, without any affirmative act on the part of the user beyond powering up." *Id.* at 315. Though "[t]he precision of this information depends on the size of the geographic area covered by the cell site," the Court noted that CSLI was "rapidly approaching GPS-level precision." *Id.* at 301, 313.

The Court concluded that "when the Government accessed CSLI from the wireless carriers, it invaded Carpenter's reasonable expectation of privacy in the whole of his physical movements," and thus conducted a search under the Fourth Amendment. *Id.* at 313. As the Court explained, "[i]n light of the deeply revealing nature of CSLI, its depth, breadth, and comprehensive reach, and the inescapable and automatic nature of its collection . . . [t]he Government's acquisition of cell-site records here was a search under [the Fourth] Amendment." *Id.* at 320.

"[T]he Court in *Carpenter* stressed that its decision was a 'narrow one.'" *Soybel*, 13 F.4th at 592 (quoting *Carpenter*, 585 U.S. at 316); *Hammond*, 996 F.3d at 389 (describing *Carpenter*'s "holding" as "limited"). Consistent with that caveat, the Seventh Circuit has "suggested that *Carpenter* should be read narrowly" and "limited to the unique features of the historical CSLI at issue there." *Tuggle*, 4 F.4th at 325. On several occasions, the Seventh Circuit distinguished other surveillance technologies from the historical CSLI at issue in *Carpenter*. First, in *Hammond*, the court held that the government's access of *real-time* CSLI—as opposed to *historical* CSLI—did not constitute a search. 996 F.3d at 391–92. Next, in *Tuggle*, the court held that use of a pole camera to surveil the outside of a suspect's house for eighteen months did not constitute a search. 4 F.4th at 526. And in *House*, the court "reaffirm[ed]" the "holding in *Tuggle* that law enforcement's warrantless use of a pole camera to observe a home on a short- or long-term basis does not amount to a search under the Fourth Amendment." 120 F.4th at 1322. Finally, in *Soybel*, the court held that "the use of a pen register to identify IP addresses visited by a criminal suspect" is not a search. 13 F.4th at 587.

Plaintiffs, however, direct the court to the Fourth Circuit's decision in *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021) (en banc). In that case, the Fourth Circuit addressed a "first-of-its-kind aerial surveillance program" operated by the City of Baltimore. *Id.* at 333. The program "use[d] aerial photography to track movements related to serious crimes," with each individual image capturing "around 32 square miles" at a resolution that could "be magnified to a point where people and cars are individually visible, but only as blurred dots or blobs." *Id.* at 334. The court held that "*Carpenter* applie[d] squarely" because the program "'track[ed] every movement' of every person outside in Baltimore" and retained that data for at least 45 days. *Id.* at 341 (quoting *Carpenter*, 585 U.S. at 307).

15

Because none of these cases directly controls the use of the ALPR system, the court "consider[s] whether the facts of this case are more similar to" *Carpenter*, *Jones*, and *Leaders of a Beautiful Struggle* or to *Knotts*, *Hammond*, *Tuggle*, *House*, and *Soybel*, as well as "how the principles and expectations that animated those decisions play out in this case." *Hammond*, 996 F.3d at 389. The court concludes that the latter group of cases is more analogous, and thus Illinois's installation and use of the ALPR system is not a "search" subject to Fourth Amendment scrutiny.

Plaintiffs' reliance on *Carpenter* encounters an early roadblock: The "search" at issue there was "[t]he Government's *acquisition* of the cell-site records," not the third-party wireless carrier's initial collection of that data. *Carpenter*, 585 U.S. at 316 (emphasis added); *see Leaders of a Beautiful Struggle*, 2 F.4th at 344 ("*Carpenter* was clear on that issue: a search took place 'when the Government *accessed CSLI* from the wireless carriers." (quoting *Carpenter*, 585 U.S. at 313)). *Carpenter* did not have occasion to consider whether the initial collection of the CSLI data constituted a search because it was the wireless carriers, not the government, that collected the data. *See United States v. Adkinson*, 916 F.3d 605, 610 (7th Cir. 2019) (holding that the Fourth Amendment was not implicated where a wireless carrier collected and voluntarily shared CSLI with law enforcement). Similarly, the *Leaders of a Beautiful Struggle* court held that the search occurred when policed "access[ed]" the aerial surveillance data. 2 F.4th at 344. The government's accessing the data in *Carpenter* and *Leaders of a Beautiful Struggle* is analogous to Illinois's querying of the LEARN database, not to its collection of ALPR photos. But, as explained above, plaintiffs lack standing to challenge the use of the LEARN database. They can challenge only the collection of data—a practice neither *Carpenter* nor *Leaders of a Beautiful Struggle* addressed.

Even assuming that the *Carpenter* and *Leaders of a Beautiful Struggle* courts would have applied the same reasoning to the collection of data that they applied to the government's access of already-collected data, Illinois's ALPR program is distinguishable from those cases (and *Jones*) in important ways.

First, the ALPR program lacks the same "depth, breadth, and comprehensive reach" as the surveillance at issue in *Carpenter*, *Jones*, and *Leaders of a Beautiful Struggle*. *See Carpenter*, 585 U.S. at 320. The historical CSLI in *Carpenter* recorded an individual's location "several times a minute." *Id.* at 300. And the data came from a cell phone, which is "almost a 'feature of human anatomy'" and "tracks nearly exactly the movements of its owner." *Id.* at 311 (quoting *Riley*, 573 U.S. at 385). In *Leaders of a Beautiful Struggle*, the aerial surveillance tracked individuals anytime they were outside in Baltimore (so long as the system was turned on). *See* 2 F.4th at 345. By contrast, the ALPR program only tracks cars. As *Carpenter* observed, "individuals regularly leave their vehicles, [but] they compulsively carry cell phones with them all the time." 585 U.S. at 311. Accordingly, ALPRs do not allow police to "achieve[] near perfect surveillance." *Id.* at 312.

16

That makes *Jones* a closer analogue. But the surveillance here is also significantly less comprehensive than in *Jones*. A GPS tracking device follows a car wherever it goes. By contrast, the ALPR system records a vehicle's location only when it passes one of a limited (though expanding) number of ALPRs, each of which is installed near the roadside of an expressway. *See* [1] ¶¶ 14–16; *see also id.* ¶ 25. Thus, the ALPR system is more akin to the beeper in *Knotts*, which "amounted principally to the following of an automobile on public streets and highways," 460 U.S. at 281, or to the stationary pole cameras in *Tuggle,* 4 F.4th at 524, and *House*, 120 F.4th at 1322.

Because it is less comprehensive, the information recorded by the ALPR system lacks the same "deeply revealing nature" as the information recorded by the surveillance technologies discussed in *Carpenter*, *Jones*, and *Leaders of a Beautiful Struggle*. *See Carpenter*, 585 U.S. at 320. The utility of ALPRs for revealing an individual's "familial, political, professional, religious, and sexual associations," *id.* at 311 (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)), is sharply limited. Knowing what portions of an expressway someone passes tells the government far less about "the 'privacies of life,'" *Riley*, 573 U.S. at 403 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)), than data that "tracks nearly exactly the movements of [a cellphone's] owner," *Carpenter*, 585 U.S. at 311. Unlike CSLI, ALPRs do not allow the government to "achieve[] near perfect surveillance, as if it had attached an ankle monitor" to someone. *Id.* at 312.

To be sure, the ALPR system shares some features that the *Carpenter* Court found important. Because license plate photos are generally stored in the LEARN database for 90 days, [1] ¶ 33; 605 ILCS 140/5, they have a "retrospective quality," allowing police to "travel back in time" and gain "access to a category of information otherwise unknowable" due to "a dearth of records and the frailties of recollection." *Carpenter*, 585 U.S. at 312; *see Leaders of a Beautiful Struggle*, 2 F.4th at 342; *Hammond*, 996 F.3d at 389 ("The *Carpenter* majority was particularly concerned with the 'retrospective quality' of the data that law enforcement collected . . . ."). And, like the surveillance methods at issue in *Carpenter* and *Leaders of a Beautiful Struggle*, ALPR data "runs against everyone"—or at least, against every driver on the specific expressways it covers—whether they have been implicated in a criminal investigation or not. *See Carpenter*, 585 U.S. at 312. For that reason, it shares some measure of the "inescapable and automatic nature" of the data collection in *Carpenter* and *Leaders of a Beautiful Struggle*. *See Carpenter*, 585 U.S. at 320.

But these considerations do not overcome the dramatically reduced scope of ALPR surveillance, relative to the surveillance techniques at issue in *Carpenter*, *Jones*, and *Leaders of a Beautiful Struggle*. That is especially so in light of the Seventh Circuit's instruction that "*Carpenter* should be read narrowly." *Tuggle*, 4 F.4th at 525.

17

In reaching this conclusion, the court joins the nearly uniform consensus of courts that have evaluated the constitutionality of ALPRs and held that their uses "were not Fourth Amendment searches requiring warrants or probable cause." *State v. Sidor*, 558 P.3d 621, 631 (Ariz. Ct. App. 2024) (collecting cases); *see, e.g.*, *United States v. Porter*, No. 21-cr-00087, 2022 WL 124563 (N.D. Ill. Jan. 13, 2022); *United States v. Brown*, No. 19-cr-00949, 2021 WL 4963602 (N.D. Ill. Oct. 26, 2021); *United States v. Toombs*, 671 F. Supp. 3d 1329 (N.D. Ala. 2023); *Commonwealth v. McCarthy*, 142 N.E.3d 1090 (Mass. 2020); *Sidor*, 558 P.3d at 629. *But see Schmidt v. City of Norfolk*, No. 2:24-cv-621, 2025 WL 410080 (E.D. Va. Feb. 5, 2025); *Commonwealth v. Bell*, 113 Va. Cir. 316 (Va. Cir. Ct. 2024).

The court does not decide whether a more extensive network of ALPRs might infringe a reasonable expectation of privacy under *Katz*. For now, it is enough to conclude that Illinois's current ALPR system is not sufficiently akin to "'attach[ing] an ankle monitor' to every person in" Illinois. *Leaders of a Beautiful Struggle*, 2 F.4th at 341 (alteration in original) (quoting *Carpenter*, 585 U.S. at 312). As *Katz* itself made clear, "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." 389 U.S. at 351. Thus, as a general matter, "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Knotts*, 460 U.S. at 281. To be sure, "individuals have a reasonable expectation of privacy in the *whole* of their physical movements." *Carpenter*, 585 U.S. at 310 (emphasis added). But, for the reasons discussed, Illinois's use of ALPRs, as alleged in the complaint, is not so intrusive as to invade that expectation. It is not a search under the Fourth Amendment.

## CONCLUSION

Defendants' motion to dismiss, [22], is granted. Because plaintiffs fail to state a claim, they have not demonstrated that they are likely to succeed on the merits. *See Braam v. Carr*, 37 F.4th 1269, 1272 (7th Cir. 2022) ("The first step in the [preliminary injunction] analysis—the plaintiff's likelihood of success on the merits—is often decisive."). Thus, plaintiff's motion for a preliminary injunction, [14], is denied.

Plaintiffs are given until April 30, 2025, to file a motion for leave to amend, if they wish to do so and believe they can do so consistent with this opinion and Rule 11. A copy of the proposed amended complaint indicating what changes the amended complaint makes to the original complaint must be attached to the motion. If no motion is filed by April 30, 2025, the court will enter final judgment and terminate this case.

Dated: March 31, 2025                     /s/ Martha M. Pacold

S.A. 18

ILND 450 (Rev. 04/29/2016)  Judgment in a Civil Action

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Stephanie Scholl, et al,

Plaintiff(s),

v.

Illinois State Police, et al.,

Defendant(s).

Case No.  24-cv-4435
Judge Martha M. Pacold

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐ in favor of plaintiff(s)
and against defendant(s)
in the amount of $          ,

which ☐ includes        pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐ in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

---

☒ other: Judgment is entered in favor of defendants Illinois State Police, Brendan F. Kelly, in his official capacity as Director of the Illinois State Police, Jay R. Pritzker, in his official capacity as Governor of Illinois, Kwame Raoul, in his official capacity as Attorney General of Illinois, and against plaintiffs Stephanie Scholl and Frank Bednarz.

---

This action was (check one):

☐ tried by a jury with Judge          presiding, and the jury has rendered a verdict.
☐ tried by Judge          without a jury and the above decision was reached.
☒ decided by Judge Martha M. Pacold on a motion to dismiss.

S.A. 19

Date:  5/2/2025                                    Thomas G. Bruton, Clerk of Court

                                                  /s/ Ruth O'Shea , Deputy Clerk

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF NextGen 1.8 (rev. 1.8.3)
### Eastern Division

Stephanie Scholl, et al.

Plaintiff,

v.                                                    Case No.: 1:24–cv–04435
                                                      Honorable Martha M. Pacold

Illinois State Police, et al.

Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, March 31, 2025:

MINUTE entry before the Honorable Martha M. Pacold: Defendants' motion to dismiss, [22], is granted. Plaintiff's motion for a preliminary injunction, [14], is denied. Plaintiffs are given until 4/30/2025, to file a motion for leave to amend. Enter Memorandum Opinion and Order. (rao, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

S.A. 21

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF NextGen 1.8 (rev. 1.8.3)**
**Eastern Division**

Stephanie Scholl, et al.
                         Plaintiff,

v.
                                                 Case No.: 1:24–cv–04435
                                                 Honorable Martha M. Pacold

Illinois State Police, et al.
                         Defendant.

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Friday, May 2, 2025:

      MINUTE entry before the Honorable Martha M. Pacold: On 3/31/2025, the court dismissed the complaint without prejudice for lack of subject matter jurisdiction and for failure to state a claim, but gave plaintiffs until 4/30/2025 to file a motion for leave to amend. [41]. Plaintiffs' status report states that plaintiffs will not file a motion for leave to amend and requests that the court enter final judgment. [42] at 1. For the reasons explained in the court's memorandum opinion and order, [41], and in light of plaintiffs' decision to decline to file a motion for leave to amend, plaintiffs' claims against defendants Illinois State Police, Jay R. Pritzker, and Kwame Raoul are dismissed without prejudice for lack of jurisdiction, plaintiffs' claims against defendant Brendan F. Kelly (to the extent those claims challenge the use of the LEARN database) are dismissed without prejudice for lack of jurisdiction, and plaintiffs' claims against defendant Brendan F. Kelly (to the extent those claims challenge the use of ALPRs) are dismissed with prejudice for failure to state a claim. Enter final judgment. Civil case terminated. (rao, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

S.A. 22

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEPHANIE SCHOLL AND FRANK BEDNARZ, <br><br> Plaintiffs, <br><br> v. <br><br> ILLINOIS STATE POLICE; BRENDAN F. KELLY, *in his official capacity as Director of the Illinois State Police*; JAY ROBERT PRITZKER, *In his official capacity as Governor of the State of Illinois*; KWAME RAOUL, *in his official capacity as Attorney General of Illinois*, <br><br> Defendants. | Case No. 24-4435 <br><br><br><br><br> **Complaint** |

## Introduction

1.      Defendants, Illinois State Police and officials responsible for that Agency, are operating a system of dragnet surveillance, recording the whereabouts of every resident of Cook County who drives a car or truck—and are expanding this mass surveillance across the entire state.

2.      Defendants are tracking anyone who drives to work in Cook County—or to school, or a grocery store, or a doctor's office, or a pharmacy, or a political rally, or a romantic encounter, or family gathering—every day, without any reason to suspect anyone of anything, and are holding onto those whereabouts just in case they decide in the future that some citizen might be an appropriate target of law enforcement.

1

S.A. 23

3. They do this via a system of Automated License Plate Readers ("ALPRs"), of which Defendants have installed hundreds and plan on installing many hundreds more.

4. Plaintiffs, Cook County residents and drivers, challenge the warrantless, suspicionless, and entirely unreasonable tracking of their movements as an unreasonable search in violation of the Fourth and Fourteenth Amendments.

### Parties

5. Plaintiff Stephanie Scholl is a resident of Cook County, Illinois. She holds a valid Illinois Driver's License. She regularly drives on the expressways in Cook County and the surrounding area, almost always using the same personal vehicle, including commuting from her home in Cook County to work in the Chicago suburbs, as well as regular other trips by car in areas covered by Illinois' ALPR system.

6. Plaintiff M. Frank Bednarz is also a resident of Cook County, Illinois. He holds a valid Illinois Driver's License. He regularly drives on the expressways in Cook County and the surrounding area, almost always using the same personal vehicle, as well as regular other trips by car in areas covered by Illinois' ALPR system.

7. Defendant Illinois State Police is the state police agency for the State of Illinois.

8. Defendant Brenden F. Kelly is the Director of the Illinois State Police.

2

9.      Defendant Jay Robert Pritzker is the Governor of the State of Illinois and is responsible for enacting and implementing the surveillance policy challenged in this case.

10.      Defendant Kwame Raoul is the Attorney General of the State of Illinois and is responsible for enforcing and defending the laws of the state of Illinois.

11.      All Defendants are sued in their official capacities.

### Jurisdiction and Venue

12.      This case raises claims under the Fourth and Fourteenth Amendments of the U.S. Constitution and 42 U.S.C. § 1983. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

13.      Venue is proper because a substantial portion of the events giving rise to the claims occurred in the Northern District of Illinois. 28 U.S.C. § 1391(b)(2).

### Facts

14.      After the 2019 shooting of a postal worker on an I-57 expressway, Illinois passed the Tamera Clayton Expressway Camera Act ("the Act"), 605 ILCS 140/1 *et seq.*, which funds and requires the installation of ALPRs on Chicago's expressways.

15.      The Act funded the installation of some 300 ALPR cameras across every expressway in Cook County—I-90 (Kennedy and Jane Addams tollway), I-290 (Eisenhower), I-55 (Stevenson), I-90/94 (Dan Ryan), I-94 (Bishop Ford), and I-57.[1]

16.      The technology does what the name implies: cameras set up by the side of the road record the license plates of cars driving by, and then feed that information

---

[1] Illinois State Police, "Automated License Plate Reader - Transparency Page," https://isp.illinois.gov/CriminalInvestigations/TransparencyPage

S.A. 25

into a national database. When a crime is committed, police can look to see what cars passed by that area at the relevant time and to whom those vehicles are registered.

17. The ALPR data has both prospective and retrospective application.

18. Prospectively, ALPRs are used to run the plates of every citizen driving past against lists of "hot" plates to track down those law enforcement has come to suspect.

19. Retrospectively, where law enforcement chooses to investigate a citizen's past movements, the ALPRs feed databases creating a comprehensive map of their travels, recording every time they've driven past ISP's cameras—and indeed every time they've driven past cameras in other jurisdictions using the same databases.

20. Under the Act, the images and data collected by "the cameras may be extracted by any authorized user and used by any municipal police department, county sheriff's office, State Police officer, or other law enforcement agency with jurisdiction in the investigation of any offenses involving vehicular hijacking, aggravated vehicular hijacking, terrorism, motor vehicle theft, or any forcible felony, including, but not limited to, offenses involving the use of a firearm; to detect expressway hazards and highway conditions; and to facilitate highway safety and incident management." 605 ILCS 140/5.

21. As ISP explains, "an ALPR is designed to capture an image of a vehicle's license plate. The software then compares the license plate number against law enforcement databases such as the National Crime Information Center (NCIC), the

4

Law Enforcement Agency Data System (LEADS), the Department of Homeland Security, and the Illinois Secretary of State (SOS), and National Amber Alert."[2]

22. In June 2022, the Governor signed an expansion, "Tamara Clayton 2.0," which extends the program beyond Cook County to 20 additional counties[3], as well as Chicago's Lake Shore Drive. Funding for this expansion comes from a $22.5 million dollar grant to ISP through the Illinois Department of Transportation (IDOT), which coordinates with ISP on the ALPR program.[4]

23. ISP has also separately partnered with the Illinois Tollway Authority to install ALPRs at tollway locations including Cook, Kane, Lake, Will, DuPage, Dekalb, and Lee Counties, with funding distinct from the IDOT grants.[5]

24. ISP maintains this Illinois State Police Automated License Plater Reader Statistics Dashboard, which publishes data on the program for public consumption.[6]

25. According to the Dashboard, as of May 2024 ISP has purchased 649 cameras through the IDOT grant as well as 18 tollway cameras, and there are 334 IDOT Cameras installed in Cook County, 71 in St. Clair County, 8 in Morgan County, and 4 in Champaign County, along with 6 tollway cameras in Cook County and 4 in Winnebago County.[7]

---

[2] *Id.*

[3] The additional counties are Boone, Bureau, Champaign, DeKalb, DuPage, Grundy, Henry, Kane, Kendall, Lake, LaSalle, Macon, Madison, McHenry, Morgan, Peoria, Rock Island, Sangamon, St. Clair, Will and Winnebago.

[4] ISP Transparency Page.

[5] *Id.*

[6] https://isp.maps.arcgis.com/apps/dashboards/77d1b36b7d9f419289cffe58d8ac9e54

[7] *Id.*

5

S.A. 27

26.     The Dashboard also provides activity statistics for the previous month. As of May 2024, it lists 4,668,716 "Hits" and 141,617,104 "Detections".[8]

27.     "Hits" are defined as "when a read license plate matched to a license entered into a Hot List or Hot Plate"; a "Hot Plate" is a license plate flagged by law enforcement for some reason: a stolen car, missing person, revoked or expired registration, or whatever other law enforcement interest in a vehicle.[9]

28.     "Detections" are "the capture of digital images or license plates and vehicles with associated metadata (date, time, GPS coordinates with vehicle image capture)."[10]

29.     The Act requires ISP to submit an Annual Report detailing program operations. The most recent covers July 2022 through June 2023.[11]

30.     The Annual Report list 1,548,456,793 Detections for that twelve-month period, 70,956,094 "Inquires where the Investigation involved Criminal Offenses (Hits related to a law enforcement database)," and 282,118 "LE Incidents searched within stored data (Inquiries made by Law Enforcement related to a hit captured within the database)."

---

[8] *Id.*
[9] *Id.*
[10] *Id.*
[11]
https://isp.illinois.gov/StaticFiles/docs/DII/Final%20ALPR%20Annual%20Report.pdf

6

S.A. 28

31.     The current vendor for ISP's ALPR cameras is Vetted Security Solutions,[12] which installs cameras that use Motorola's "Vigilant" system[13], feeding every detected license plate into Vigilant's Law Enforcement Archival Reporting Network ("LEARN") database.

32.     LEARN is a national database, with billions of license plate "Detections" from all around the country stored and retained for later used by law enforcement at their discretion. *See, e.g. United States v. Yang*, 958 F.3d 851, 863 (9th Cir. 2020) (Postal Inspectors in Nevada used LEARN to apprehend suspect). This means that the Detections captured by ISPs cameras are available to other Vigilant customers nationwide, and that ISP has access to Detections made by other jurisdiction's ALPRs around the country.

33.     According to ISP, Detections from the ISP cameras are stored in the LEARN database for 90 days.[14] This would mean that at any given time ISP retains approximately 350 to 450 million Detections, in addition to the Detections shared with LEARN by other Vigilant customers.

34.     The 90-day retention limit is not set by Vigilant; rather, each individual client of Vigilant decides which data to retain: "As the data is [our clients'] property, it is held according to the retention policy set forth by [them]. Retention policies

---

[12] Contract between Vetted Security Solutions and ISP, executed Janaury 9, 2023, https://isp.illinois.gov/StaticFiles/docs/CriminalInvestigations/ISP%20and%20Vetted%20Security%20Soluations%20contract.pdf
[13] https://www.motorolasolutions.com/en_us/video-security-access-control/license-plate-recognition-camera-systems/vigilant-vehiclemanager-lpr-analytics-software.html
[14] ISP Transparency Page.

S.A. 29

may be adjusted by the Agency or Site Manager at any time, and different retention policies may be set for "detections" and "hits" to allow for consistency with any policy in place and/or legislation."[15] Defendants could therefore extend the retention of such data indefinitely at their discretion and have access to Detections from other jurisdictions that may have shorter or longer retention periods.

35. According to Motorola, "data collected by Motorola's customers is the property of the respective customer . . . and Motorola has no rights or ownership to any of this data."[16]

36. As a practical matter, the LEARN data is maintained on private Vigilant servers, with Motorola serving as custodian for its law enforcement clients, not on servers controlled by ISP or other law enforcement agencies.

37. ISP's system of ALPRs subjects every citizen who relies on a car or truck for transportation, including Plaintiffs, to unwarranted, suspicionless dragnet surveillance.

38. ISP records every time Plaintiffs drive a car around Cook County, and stores that information for future criminal investigations of them, without any probable cause or reasonable suspicion.

---

[15] Motorola, "MANAGING YOUR LPR DATA FAQ,"
https://www.motorolasolutions.com/content/dam/msi/docs/products/license-plate-recognition-systems/vigilant-vehiclemanager/lpr_data_management_faq_en_us.pdf
[16] *Id.*

S.A. 30

39.     Indeed, ISP does not even have *unreasonable* suspicion: they have no suspicion at all. Rather, they collect all the public movements of every car they can in Illinois—and every car they can around the country.

40.     ISP is tracking the movements of millions of citizens, including Plaintiffs, and just holding onto that mass surveillance data in case one day some police officer decides to target Plaintiffs for specific investigation—warranted or unwarranted.

## COUNT I

**The tracking of Plaintiffs' movements constitutes a violation of their Fourth Amendment and Fourteenth Amendment rights against unreasonable searches**

41.     The allegations contained in all preceding paragraphs are incorporated herein by reference.

42.     The Fourth Amendment has been incorporated against the states via the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643 (1961).

43.     Defendants deprive Plaintiffs of their Fourth Amendment right against unreasonable searches by tracking their movements via continuous dragnet surveillance of any citizen who drives a car.

44.     In depriving Plaintiffs of their Fourth Amendment rights, Defendants, and their agents, are acting under color of state law.

45.     Plaintiffs have a reasonable expectation of privacy that society is prepared to recognize as legitimate in the aggregation location data over time. *Carpenter v. United States*, 138 S. Ct. 2206 (2018); *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J. concurring).

9

46.     It is an unreasonable search when the government tracks the movements of every citizen who drives a car just in case it might someday have reasonable suspicion as to one of the millions of people being tracked.

47.     Defendants do not have any substantial or exigent government interest that would justify searching every citizen who drives a car, every day, and retaining that record of every citizen's movements.

48.     Defendants' policies are not narrowly tailored to the means least restrictive of Plaintiffs' privacy.

49.     Plaintiffs are entitled to declaratory and injunctive relief against defendants for the violation of their Fourth Amendment right against search a seizure.

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.     Enjoin the implementation of the operative version of the Tamera Clayton Expressway Camera Act, 605 ILCS 140/1 et seq.,

B.     Enjoin Defendants from operating the existing system of ALPRs to track Plaintiffs.

C.     Enjoin Defendants from installing additional ALPRs that would track Plaintiffs if they continues to drive cars in Illinois.

D.     Award Plaintiffs their reasonable costs, expenses, and attorneys' fees pursuant to any applicable law; and

E.     Award Plaintiffs any additional relief the Court deems just and proper.

10

Dated: May 30, 2024

Respectfully submitted,

Stephanie Scholl and Frank Bednarz

By: <u>Jeffrey Schwab</u>
One of their Attorneys

Jeffrey Schwab
Reilly Stephens*
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
(312) 637-2280
jschwab@ljc.org
rstephens@ljc.org
*Motion for Admission forthcoming

11

S.A. 33